UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANDREA M. DALEY,
                                                                  Plaintiff,
    v.                                                                   No. 12-CV-184
                                                                              (MAD/CFH)
COMMISSIONER OF SOCIAL SECURITY

                                              Defendant.
_____

**APPEARANCES:**                                        **OF COUNSEL:**

PETER M. MARGOLIUS, ESQ.
Attorney for Plaintiff
7 Howard Street
Catskill, New York 12414

HON. RICHARD S. HARTUNIAN          MONIKA K. PROCTOR, ESQ.
United States Attorney for the            Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff Andrea Daley ("Daley") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for benefits under the Social Security Act. Daley moves for a finding of disability and the Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 10, 14. For the reasons which follow, it is recommended that the

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born on September 29, 1981, Daley was twenty-seven years old when she applied for disability benefits. T. 113.[2] Daley received a General Educational Development ("GED") degree in 2000. T. 40, 121-22. Daley was previously employed as cashier at a convenience store and laborer at a manufacturing plant. T. 117-18. Daley alleges disability from her heart and kidney problems, Tuner's Syndrome, panic attacks, anxiety, and depression. T. 41-43, 48-49.

### B. Procedural History

On June 26, 2009, Daley filed an application for disability insurance benefits and social security income ("SSI") pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of January 1, 2006. T. 97-100, 113-115. That application was denied on December 16, 2009. T. 55-58. Daley requested a hearing before an administrative law judge ("ALJ"), Michelle Marcus, which was held on January 11, 2011. T. 35-51, 59-96. Prior to that hearing, Daley's Social Security Representative, Janice Cammarato, requested an amendment of Daley's alleged onset date from 2006 to January 28, 2008. T. 173-74. In a decision dated May 24, 2011, the ALJ held that Daley was not entitled to disability benefits. T. 16-34. Daley's counsel

---

[2]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Docket No. 8.

filed a timely request for review with the Appeals Council and on November 25, 2011, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. T. 1-15. This action followed.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry, 675 F.2d at 467. Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

3

## B. Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently

---

[3] While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

### C. ALJ Marcus's Findings

Daley, represented by a non-attorney representative, testified at the hearing held on January 11, 2011. T. 35-51 (transcript from the administrative hearing); 49-53; 154-60. Using the five-step disability sequential evaluation, the ALJ found that Daley (1) had not engaged in substantial gainful activity since June 26, 2009; (2) had the following severe medically determinable impairments, Turner's Syndrome, pericardial effusion, kidney stones, and anxiety disorder; (3) did not

5

have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the Residual Functional Capacity [("RFC")] to perform light work as defined in 20 C.F.R. [§] 416.967(b) except [that Daley] . . . is unable to interact with the public," and thus, (5) given her age, education, work experience, and RFC, was capable of performing "jobs that exist in significant numbers in the national economy . . . ." Therefore, a determination of not disabled was made.

### D. Daley's Contentions

Daley contends that the ALJ erred in determining Daley's Residual Functional Capacity ("RFC"). First, Daley contends that the ALJ failed to give the opinion of the consultative examiner, Annette Payne, Ph.D., the appropriate weight. Second, Daley asserts that the ALJ's RFC finding was not supported by substantial evidence because the ALJ failed to incorporate additional moderate limitations into her RFC assessment.[4]

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory

---

[4] Daley does not argue that the exertional (physical) limitations from her RFC were not supported by substantial evidence. Thus, discussion with respect to her physical abilities will not be further examined.

statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

> Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient . . . Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

DiVetro v. Comm'r of Soc. Sec., No. 05-CV-830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

The ALJ determined that Daley could perform light work[5] "except th[at she] is unable to interact with the public." T. 22. In arriving at her conclusion, the ALJ "g[a]ve great

---

[5]
> Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking . . . or when it involves sitting most of the time with some pushing and pulling of arm or leg controls . . . If someone can do light work, . . . he or she can also do sedentary work, unless there are additional limiting factors such as a loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

7

weight to Dr. Jaeger," and "[s]ome weight . . . to Dr. Wakeley and Dr. Alpert . . . [and] Dr. Payne."  T. 26-27.  The ALJ also concluded that while Daley's "impairments could reasonably be expected to cause the alleged symptoms; [her] . . . statements concerning the intensity, persistence and limiting effects . . . are not credible to the extent they are inconsistent with the above [RFC] . . . and with the body of the record."  T. 27.

In January of 2008, Daley presented to Columbia Memorial Hospital for a kidney impairment, which was suggestive of kidney stones.  T. 180-84.  In June of 2008, Daley underwent a follow-up with Dr. Subudhi for the kidney stones, requesting that she return for another follow-up two months later.  T. 285-86.  No such follow-up appointment occurred.

On December 1, 2008, Dr. Amin provided Daley with cardiac care via an echocariogram.  T. 187.  Dr. Amin concluded that Daley "probably [had a] mild to moderate" pericardial effusion, and that, as compared to a prior radiology report in September of 2008, no major changes had occurred.  Id.  A month later Dr. Amin wrote Daley a prescription indicating that she could not work.

In January of 2009, Daley began treatment with Dr. Kudria for her primary care services.  T. 190.  On January 12, 2009 Dr. Kudria noted that Daley "denie[d] symptoms of shortness of breath [and] chest pain [and] occasionally ha[d] palpatations which [were] now somewhat better."  Id.  It was also recommended that Daley undergo additional testing.  Id.  Daley explained "that she is feeling reasonably well . . . and is apparently physically active."  Id.  Daley returned for another follow-up February 24, 2009 and Dr. Kudria noted that she had failed to undergo any of the confirmatory testing

8

recommended or ordered at her previous appointment as "she has a lot of other appointments and doesn't have time to keep all the appointments . . . [or] do the tests which were ordered." T. 191. Daley had also cancelled appointments to undergo testing and meet with Dr. Kudria. Id. It was noted that Daley's "main reason for today's appointment . . . [wa]s for [Dr. Kudria] to fill out the paperwork for the Department of Social Services to state what limitations she has to prevent regular employment." Id. Daley again reported no shortness of breath or chest pain, as well as no "headaches, lightheadedness, or dizziness," though she did state she had palpitations in the past. T. 192. Dr. Kudria stressed "the need for proper workup and . . . follow-up . . . [and explained he could]not adequately treat her with[out] the results of the test [he] ordered to clarify her medical condition." Id. Daley was to undergo a follow-up appointment in a few months. Daley returned to Dr. Kudria on June 1, 2009. T. 194. Cardiac monitoring revealed unremarkable and asymptomatic results with an average heart rate. Id. Daley again had no complaints of headaches, lightheadedness, dizziness, shortness of breath or chest pains. Id. Daley was prescribed Tramadol as needed for her back pain. T. 195.

On July 14, 2009, Daley returned to Dr. Amin. T. 203. Dr. Amin noted that Daley never underwent the radiological reports he requested. Id. Daley also reported rare instances of palpitations, lasting for only seconds at a time, and no shortness of breath or other symptoms. Id. Dr. Amin advised Daley to undergo the radiology exams in light of her heart condition. T. 204. Daley also agreed to begin taking a prescription to lower her cholesterol. Id.

On or about September 9, 2009, medical consultant Dr. Wakeley reviewed Daley's

9

chart. T. 205-06. Dr. Wakeley concluded that Daley had "completely asymptomatic pericardial effusion . . . [with p]alpitations lasting only seconds no[ne of which were] documented on [the] Holter [test]." T. 205. Dr. Wakeley opined that Daley could sit, stand, and walk for six hours in an eight hour work day and lift twenty pounds. Id.

On November 16, 2009, Dr. Payne completed both a psychiatric and intelligence evaluation. T. 207-17. Daley denied any inpatient mental health hospitalizations or outpatient treatment. T. 207, 212. Daley complained of depression and anxiety which manifested itself with "dysphoric mood, crying, guilt, hopelessness, loss of interest, irritability, fatigue, worthlessness, diminished self-esteem, cognitive interference, and a diminished sense of pleasure." T. 208, 213. Daley also shared that "she has had palpitations, nausea, sweating, dizziness, difficulty breathing, chest pain, and choking sensation[s]." T. 208, 213. Dr. Payne concluded that Daley's (1) thought process was "coherent and goal directed;" (2) orientation was in tact; (3) "attention and concentration were mildly impaired [with Daley being] able to perform simply [but not more complicated] calculations;" (4) "[r]ecent and remote memory skills were grossly intact;" (5) "cognitive functioning was in the low average range;" and (6) judgment and insight were fair. T. 209-10; see also T. 214 (explaining that Daley's "attention and concentration fluctuated."), 215 (reporting Daley's intelligence as low average). Daley reported that she was capable of completing her own self-care, cleaning, laundry, shopping, and money management. T. 210, 15. Daley spent her days watching television, listening to music, running errands, and attending to her other personal needs. Id. While Dr. Payne concluded that Daley suffered from anxiety and depression, her ultimate prognosis was fair. T. 211. Ultimately, Dr. Payne concluded that Daley

would have (1) mild difficulty performing both complex and simple tasks and maintaining attention and concentration; (2) mild to moderate difficulty following and understanding simple directions and instructions, maintaining a regular schedule, and making appropriate decisions; and (3) moderate difficulty learning new tasks, relating to others, and responding to changes in the environment. T. 210, 215.

On December 16, 2009, Dr. Alpert, a consultative examining psychiatrist, completed both the psychiatric review technique and a mental RFC questionnaire. T. 218-236. Dr. Alpert concluded that Daley was not significantly limited in her ability to (1) remember locations and work procedures; (2) understand, remember, and carry out short and simple instructions; (3) independently sustain an ordinary routine; (4) work in coordination and proximity to others; (5) make simple work decisions; (6) interact with the public and coworkers and respond to criticism from supervisors; and (7) be aware of normal hazards and take appropriate precautions. T. 232-33. Dr. Alpert also concluded that Daley was moderately limited in her ability to (1) understand, remember, and carry out detailed instructions; (2) perform activities within and maintain a regular schedule; (3) complete a normal workday and workweek without psychologically induced interruptions; (4) respond appropriately to changes in the work place setting; (5) travel in unfamiliar places; and (6) independently set realistic goals and make plans. T. 232-33.

Dr. Alpert summed up his report by stating that Daley "relate[d] well with all who are on [the file] and . . . denie[d] any problems interacting and relating with others." T. 235. Moreover, "[t]he totality of the data . . . d[id] not support any severe limitations interacting or relating with others in a workplace environment." Id. In conclusion, Daley retained "the ability to carry out work procedures with a consistent pace, interact adequately with

coworkers and supervisors, adapt to changes and handle stress in the workplace." Id.

Medical notes from the Spring of 2009 indicate that Daley's urologists requested her to undergo an ultrasound in order to diagnose and treat her kidney stones. T. 283-84. This was not completed. Id. Additionally, treatment notes from Dr. Kudria's office indicate that, as of June 9, 2010, Daley had failed to follow up with her cardiologist, Dr. Amin, begin the medication he prescribed for her, or undergo the recommended testing. T. 279-80.

In September of 2010, Daley began treating with Dr. Jaeger for her primary care. T. 308. Dr. Jaeger indicated that Daley was applying for disability benefits. Id. While Daley complained of lightheadedness and palpitations, she denied chest pain, discomfort, difficulty breathing, racing heart beats, fainting, fatiruge and shortness of breath. T. 309. Daley also denied any musculoskeletal complaints including cramps, joint pain, stiffness, muscle weakness, or loss of strength. Id. Daley's pulse and heart rate were normal and her psychiatric state was alert and cooperative with normal mood, affect, attention span, and concentration. T. 310.

In October of 2010, Daley attended her first assessment for any mental health counseling. T. 291-95. The assessment by the social worker indicated that Daley's alertness and thought content were within normal limits, her attitude was cooperative, her concentration while subjectively reported as poor was adequate during the interview, her memory was good, her cognitive functioning was average, and her insight and judgment were fair. T. 301. Additionally, Daley was diagnosed with social phobia with generalized anxiety disorder and non-specific depressive disorder, with a current noted

12

Global Assessment Functioning ("GAF") score of 55 and a prior GAF score of 65.[6]  T. 291.

On November 24, 2010, Daley returned to her cardiologist, Dr. Amin, for a follow-up. T. 323-24.  Daley "did not starting taking the [prescribed] medication, did not have followup blood tests, . . . did not come back for followup as . . . advised . . ., [and] did not go for a chest x-ray . . [or] CT scan . . . [as] advised."  T. 323.  Daley also "denie[d] any palpitations or dizziness . . ., unusual shortness of breath, chest pain, pedal edema, orthopriea, or PND."  Id.  Daley had no new symptoms and her examination was otherwise unremarkable.  Id.  Dr. Amin again recommended various tests and medications, but Daley refused to take them requesting instead for "a statement [about Daley] . . . being unable to work because of anxiety."  T. 324.  Dr. Amin directed Daley to her primary care doctor or psychiatrist.  Id.

On December 9, 2010, Dr. Jaeger authored a letter indicating that Daley was applying for SSI benefits, "ha[d] Turners Syndrome . . . and [wa]s unable to do strenuous

---

[6] The GAF scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psychiatric Ass'n, 4th Ed. 2000) ("DSM-IV-TR").

> A GAF between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  A GAF between 71 and 80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning.

Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (internal quotation marks, alterations, and citations omitted) (citing to DSM-IV_TR at 34)

13

work because of heart palpitations." T. 303. During the examination that same day, Daley explained her need for a medical statement explaining why she was unable to work and Dr. Jaeger suggested Daley see a mental health provider for such documentation as Daley claims disability due to anxiety and depression. T. 304. Daley complained of racing heart, fatigue, lightheadedness, shortness of breath with exertion, palpitations, cough, anxiety, depression, and mental problems. T. 305. Daley again had no musculoskeletal complaints and her pulse and heart rate were normal. T. 305-06. Daley was instructed to undergo another echocardiogram to assist with her palpitations. T. 307.

In January 2011, Daley returned to her cardiologist Dr. Amin. T. 320-22. Daley had no new symptoms, claimed to be active and able to walk for up to a mile without shortness of breath, failed to report any palpitations or dizziness, and reported that she still had yet to begin taking the prescribed cholesterol medication or undergo her radiology tests. T. 320. Daley did undergo an echocardiogram however, which showed no significant changes as compared to the report results from December 2008. T. 320, 322.

Daley contends that more weight should have been accorded to Dr. Payne because she is a specialist. In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]" Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir.1993) (discussing 20 C.F.R. §§ 404.1527, 416.927). Ordinarily more weight is given to a treating source. Under the regulations, a

14

treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). The ALJ gave great weight to Dr. Jaeger, Daley's treating source, except with respect to the exertional limitations of sitting and standing which were inconsistent with her prior examinations which showed no complaints or deficiencies in Daley's musculoskeletal examinations.

To the extent that the ALJ accorded Dr. Jaeger's mental limitations great weight, such conclusions are supported by substantial evidence. Specifically, Dr. Jaeger's other notes indicate that Daley's mood, affect, attention and concentration were all normal. Such minimal findings are consistent with some of the findings of the consultative examiners, who were all afforded some weight by the ALJ. Dr. Payne concluded that Daley only had mild difficulty in performing all tasks and maintaining her attention and concentration. Dr. Payne stated that Daley had difficulties ranging from mild to moderate in various other categories and explicitly moderate difficulty with relating to others. Dr. Payne's objective findings upon examination, that (1) Daley's attention and concentration were only mildly impaired; (2) Daley could perform simple calculations; and (3) her memory skills were intact and insight and judgment fair also support the RFC determination. Furthermore, Dr. Alpert's assessment also indicated that Daley was not significantly limited in her abilities to perform simple tasks, maintain her routine, work with other, make decisions, and interact with coworkers and supervisors. Similarly, Dr. Alpert's ultimate conclusion was that Daly could "carry out work procedures with a consistent pace, interact adequately with coworkers and supervisors, adapt to changes

15

and handle stress in the workplace," also support the ALJ's RFC and serve as substantial evidence. Finally, during Daley's initial mental health assessment and screening it was noted that her alertness and thought content were within normal limits, she was cooperative, her memory was good, her insight and judgment were fair, and despite subjective reports to the contrary her concentration was adequate.

Furthermore, Daley's own testimony indicates that the RFC determination was appropriate. Daley consistently reported that she could manage her own self-care, cleaning, cooking, and financial responsibilities. Daley would leave the house to go shopping and could read, write, and also perform basic math. T. 40. Such abilities are consistent with the RFC to perform light duty work.

While the record reflects that Dr. Payne was a specialist and that there were different opinions between Drs. Payne and Jaeger regarding the degree of severity of Daley's mental limitations, that does not end the analysis. Daley also seeks to support Dr. Payne's additional limitations by pointing to the fact that when she was evaluated during her initial mental health treatment she was noted to have a current GAF score of 55, with a prior score the previous year of 65. Such records, Daley contends, in combination with the more severe limitations discussed above, which were considered by the ALJ, represent substantial evidence requiring remand. Daley's citations to the record are correct however, even "[w]here evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." Ryan v. Astrue, 650 F. Supp. 2d 207, 211 (N.D.N.Y. 2009) (citing Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)). Thus, after consideration of the record as a whole, where the ALJ's findings are supported by substantial evidence,

16

> even where substantial evidence may [also] support the
> plaintiff's position and despite the fact that the court's
> independent analysis . . . may differ from the
> Commissioner's . . . the Commissioner's determination [is
> afforded] considerable deference, and [the court] may not
> substitute its own judgment for that of the Commissioner
> even if it might justifiably have reached a different result . . . .

Id. (internal quotation marks, alterations, and citations omitted).

For the reasons previously discussed, the ALJ's RFC determination is supported by substantial evidence. Thus, the ALJ's RFC should be affirmed. Furthermore, to the extent Daley contends that more severe limitations should be incorporated into her RFC, such contentions are also denied given the substantial evidence supporting the ALJ's conclusions. Moreover, the ALJ's decision to discredit Daley's subjective complaints, while not advanced as error by Daley, is also supported by substantial evidence and serves to bolster the ALJ's decision to include such minor RFC limitations. While Daley contends that she had severe physical and mental impairments, the medical record is replete with instances of Daley failing to make appointments, undergo testing, take prescribed medication, attend appointments, or seek out treatment. Daley first began receiving mental health treatment a week before attending her hearing (T. 45), despite years of allegedly disabling symptoms.

Daley's current contentions of increased limitations to her RFC are vitiated by her persistent failure to undergo treatment generally, but specifically for her anxiety and depression. "A longitudinal medical record demonstrating an individual's attempts to seek medical treatment . . . and to follow that treatment once it is prescribed . . . [assists in] judging the credibility of the individual's statements." SSR 96-7p, 1996 WL 374186, at *8. A claimant may be deemed "less credible if the level or frequency of treatment is

17

inconsistent with the level of complaints, or if the medical . . . records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Id.

As "[i]t is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, . . . [i]f the [Commissioner's] findings are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Sec., Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations and internal quotation marks omitted). Accordingly, for the reasons cited above, the ALJ's decision to accord Daley's testimony less credibility is supported by substantial evidence in the record. Furthermore, such conclusions also support the ALJ's RFC determination which refused to incorporate more stringent limitations.

Lastly, to the extent Daley contends that the limitations placed on her precluding her from public contact would severely diminish her employment base, such contentions are meritless.

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15. Daley's RFC does not include substantial limitations in her abilities to comprehend or complete simple tasks, respond to supervisors, coworkers or work

situations, or deal with changes in a routine work setting.  Conversely, Daley's mental limitation precluding her from public contact is not enumerated as one of the essential traits without which the occupational base would be severely eroded.  As unskilled "jobs ordinarily involve dealing primarily with objects, rather than with data or people," they provide employment opportunities for those with constraints similar to Daley.  Id.

Therefore, it is recommended that the Commissioner's decision on this issue be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

Date:  March 4, 2013
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge